# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
Filed: January 6, 2020

```
* * * * * * * * * * * * * * * * * * * * * * * * *
 EMILY MIDDLETON,                *    No. 17-1910V
                                 *
            Petitioner,          *    Special Master Sanders
                                 *
 v.                              *
                                 *
 SECRETARY OF HEALTH             *    Attorneys' Fees and Costs; Reasonable
 AND HUMAN SERVICES,             *    Basis; Reduction for Unnecessary Billing;
                                 *    Reduction for Airline Costs; Reduction for
            Respondent.          *    Meals
* * * * * * * * * * * * * * * * * * * * * * * * *
```

*Michael G. McLaren*, Black McLaren, et al., PC, Memphis, TN, for Petitioner.
*Daniel A. Principato*, United States Department of Justice, Washington, D.C., for Respondent.

## DECISION[1]

On December 8, 2017, Emily Middleton ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Program" or "Program").[2] 42 U.S.C. § 300aa-10 to 34 (2012). Petitioner alleged that she developed "Rheumatoid Arthritis [("RA")[3]] and/or other neurologic and physical impairments and other injuries" as a result of the Human Papilloma Virus ("HPV") vaccinations she received on May 28, 2015, August 14, 2015, and/or February 29, 2016. Pet. at 1, ECF No. 1. On April 22, 2019, Petitioner filed a motion for a decision dismissing her petition, *see* ECF No. 37, and I dismissed her petition on April 30, 2019, ECF No. 38.

---

[1] This decision shall be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet**. In accordance with Vaccine Rule 18(b), a party has 14 days to identify and move to delete medical or other information that satisfies the criteria in § 300aa-12(d)(4)(B). Further, consistent with the rule requirement, a motion for redaction must include a proposed redacted decision. If, upon review, the undersigned agrees that the identified material fits within the requirements of that provision, such material will be deleted from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub L. No. 99-660, 100 Stat. 3755 ("the Vaccine Act" or "Act"). Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

[3] Rheumatoid arthritis is "a chronic systemic disease primarily of the joints . . . marked by inflammatory changes in the synovial membranes and articular structures and by muscle atrophy and rarefaction of the bones. . . . The cause is unknown, but autoimmune mechanisms and virus infection have been postulated." *Dorland's Illustrated Medical Dictionary* 157 (32nd ed. 2012) [hereinafter "*Dorland's*"].

On May 31, 2019, Petitioner filed a motion for attorneys' fees and costs, seeking $33,368.90 in attorneys' fees and $4,522.84 in costs, for a total of $37,891.74. Pet'r's Mot. for Attys' Fees and Costs, ECF No. 42 [hereinafter Pet'r's Mot. for AFC]. On June 14, 2019, Respondent filed his response to Petitioner's motion, objecting on the basis that Petitioner failed to establish a reasonable basis for her claim. Resp't's Resp. at 1, ECF No. 44. Petitioner filed her reply brief on June 21, 2019. Pet'r's Reply, ECF No. 46. For the reasons stated below, I find that Petitioner satisfied the statutory requirements for an award of attorneys' fees and costs, and therefore **GRANT** Petitioner's motion.

## I. Procedural History

Petitioner filed her petition on December 8, 2017. Pet. at 1. On December 12, 2017, Petitioner filed six exhibits in support of her petition. Pet'r's Exs. 1–6, ECF Nos. 7-1–7-6. Petitioner filed a statement of completion on the same day, ECF No. 8, and I ordered Respondent to file a status report identifying any outstanding medical records by January 2, 2018, *see* Non-PDF Order, docketed Dec. 12, 2018.

Over the next six months, Respondent filed five motions for extensions of time, *see* ECF Nos. 10–11, 13, 15, 17, which I granted, *see* Non-PDF order, docketed on Dec. 28, 2017, ECF Nos. 12, 14, 16. On July 9, 2018, Respondent filed a sixth motion for extension of time. ECF No. 19. Petitioner filed a response on the same day, indicating her opposition to Respondent's motion and requesting that I "set a deadline for Respondent's Rule 4(c) report." Pet'r's Resp., ECF No. 20. I issued an order denying Respondent's motion on July 17, 2018, and ordered Respondent to complete a review of the medical records and file a status report identifying any outstanding medical records by July 24, 2018. ECF No. 21 at 3. I also ordered Respondent to file his Rule 4(c) report by August 31, 2018. *Id.*

On July 24, 2018, Respondent filed a status report in which he identified outstanding records needed in order to form a position on the claim. ECF No. 22. On the same day, Petitioner filed a response to Respondent's status report in which she stated that her medical records were "complete except for updates that would only go to damages and not causation." Pet'r's Resp., ECF No. 23. On August 7, 2018, I ordered Petitioner to file any outstanding records by August 24, 2018. Non-PDF Order, docketed Aug. 7, 2018. Petitioner filed one additional exhibit and a statement of completion on August 23, 2018. Pet'r's Ex. 7, ECF No. 26-1; ECF No. 27.

Respondent filed his Rule 4(c) report on August 30, 2018, in which he argued that "compensation [was] not appropriate in this case." Resp't's Report at 1, ECF No. 28. On August 31, 2018, I ordered Petitioner to file an expert report by October 30, 2018. ECF No. 29. Over the next five months, Petitioner filed two motions for extensions of time, ECF Nos. 31–32, which I granted, extending Petitioner's deadline to February 27, 2019, *see* Non-PDF Order, docketed Oct. 30, 2018; ECF No. 33. On February 27, 2019, Petitioner filed a third motion for extension of time, seeking an additional thirty-day extension of her deadline. ECF No. 34. The motion indicated that Petitioner's "counsel [had] had difficulty with[,] and [had] not been able to[,] successfully contact Petitioner to discuss how Petitioner wishe[d] to proceed." *Id.* at 1. Petitioner requested "[thirty] more days to continue these efforts to provide the Court with a plan

for moving forward." *Id.* I granted Petitioner's motion on the same day and ordered her to file a status report indicating how she wished to proceed by March 29, 2019. Non-PDF Order, docketed Feb. 27, 2019.

On March 29, 2019, Petitioner filed a status in which she indicated that she "intend[ed] to submit a motion for a dismissal decision . . . ." ECF No. 35 at 1. On April 1, 2019, I ordered Petitioner to file her motion for dismissal by May 1, 2019. ECF No. 36. Petitioner filed an unopposed motion to dismiss her petition on April 22, 2019, ECF No. 37, and I issued an order dismissing her petition on April 30, 2019, ECF No. 38.

Petitioner filed her motion for attorneys' fees and costs on May 31, 2019. Pet'r's Mot. for AFC. Respondent filed his response on June 14, 2019, objecting to an attorneys' fees and costs award on the grounds that Petitioner had not established a reasonable basis to bring her claim. Resp't's Resp. Petitioner filed her reply on June 21, 2019. Pet'r's Reply.

This matter is now ripe for consideration.

## II. Factual Background

Petitioner received the first dose of the HPV vaccine May 28, 2015, and the second dose on August 14, 2015. Pet'r's Ex. 2 at 1. On August 27, 2015, Petitioner presented to the emergency room with complaints of nausea, diarrhea, and abdominal pain for one day. Pet'r's Ex. 3 at 106. She reported that she "went to bed fine" two nights prior but "woke up in the middle of the night . . . with abdominal pain and diarrhea." *Id.* She also complained of chills but denied fever. *Id.* A workup revealed a normal white blood cell count, a urinalysis showed no sign of infection, and a CT scan revealed "no evidence of acute appendicitis." *Id.* at 110. Petitioner was assessed with acute gastroenteritis and discharged home in "stable condition . . . with [a] prescription for Zofran[4]." *Id.*

On August 28, 2015, Petitioner returned to the emergency room, because she "vomited twice" that morning and had continued diarrhea. *Id.* at 86. Doctors administered IV fluid, after which Petitioner reported feeling "much better." *Id.* at 90. She was again assessed with acute gastroenteritis and was discharged home with directions "to take Zofran as needed for nausea and vomiting" and "drink plenty of . . . fluids." *Id.*

Petitioner saw her primary care physician ("PCP") on September 1, 2015, for a follow-up for continued diarrhea. Pet'r's Ex. 2 at 22. Petitioner reported experiencing diarrhea for "the past [six] days." *Id.* In addition, Petitioner stated that she was still experiencing abdominal cramps, but that the nausea and vomiting had resolved. *Id.* An examination revealed "mild diffuse tenderness" in Petitioner's abdomen but was otherwise normal. *Id.* at 23. Petitioner was assessed with diarrhea. *Id.* She was ordered to "begin . . . [drinking] a glucose and electrolyte containing solution" and "use [over-the-counter] anti-diarrheals." *Id.*

---

[4] Zofran is the "trademark for preparations of ondansetron hydrochloride." *Dorland's* at 2092. Ondansetron hydrochloride is "an antiemetic used for prevention of nausea and vomiting occurring after surgery or in conjunction with cancer chemotherapy or radiotherapy; administered orally or intravenously." *Id.* at 1321.

3

On February 18, 2016, Petitioner presented to her PCP with complaints of "muscle aches." *Id.* at 19. Petitioner reported that she had been "diagnosed [with muscle aches two] weeks ago,"[5] and the "course ha[d] been rapidly worsening." *Id.* Petitioner "denie[d] abdominal pain, chest pain, fever, headache[s], palpitations, rash[, or] sore throat[,]" and she described the muscle aches as "moderate [in] intensity." *Id.* An examination revealed "pedal[6] edema[7]" and anxiety, and a review of systems revealed "generalized edema,[8]" "myalgias,[9]" and "anxiety." *Id.* at 19–20. Petitioner was assessed with muscle aches and prescribed diclofenac sodium.[10] *Id.* at 20.

Petitioner returned to her PCP for a follow-up on February 22, 2016, and reported muscle aches and a two-week history of edema "primarily involv[ing] the arms and lower legs." *Id.* at 16. She again described the muscle aches as "progressively worsening . . . [and] of moderate intensity," while she described the edema as "getting worse recently." *Id.* Petitioner "denie[d] calf pain, dyspnea, lower extremity skin changes[, or] orthopnea." *Id.* Petitioner was assessed with muscle aches and edema and prescribed Lasix[11] and potassium chloride[12]. *Id.* at 18.

On February 24, 2016, Petitioner presented to the emergency room and reported a "[ten-]day history of sudden onset upper and lower extremity edema." Pet'r's Ex. 3 at 65. Petitioner explained that "she ha[d] upper extremity edema in the morning upon waking [and] . . . difficulty moving her hands and wrists due to pain and stiffness, as well swelling." *Id.* She noted that "[a]s the day [went] on[,] the swelling and stiffness in her hands [got] better, but her legs had worsening edema and pain." *Id.* Petitioner reported "minimal response" to prescription intervention. *Id.* An examination revealed bilateral upper and lower extremity weakness, *id.* at

---

[5] Petitioner did not file this medical record, so it is unclear which provider made this diagnosis or on what date this visit occurred.

[6] Pedal is defined as "pertaining to the foot or feet." *Dorland's* at 1400.

[7] Edema is "the presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body, usually referring to subcutaneous tissues." *Dorland's* at 593. Subcutaneous tissue (a.k.a. tela subcutanea) is "the layer of loose connective tissue situated just beneath the skin." *Dorland's* at 1878.

[8] Generalized edema is "edema that is caused by poor venous return and is not localized by the effects of contrast . . . ." *Dorland's* at 593.

[9] Myalgia is defined as "pain in a muscle or muscles." *Dorland's* at 1214.

[10] Diclofenac sodium is "the sodium salt of diclofenac, administered orally in the treatment of [RA], osteoarthritis, . . . and also for a variety of nonrheumatic inflammatory conditions." *Dorland's* at 513. Osteoarthritis is "a non[-]inflammatory degenerative joint disease seen mainly in older persons, characterized by degeneration of the articular cartilage, hypertrophy of the bone at the margins, and changes in the synovial membrane. It is accompanied by pain, usually after prolonged activity, and stiffness, particularly in the morning or with inactivity." *Id.* at 1344.

[11] Lasix is the "trademark for preparations of furosemide." *Dorland's* at 1007. Furosemide is "a loop diuretic used in the treatment of edema associated with congestive heart failure or haptic or renal disease, as an adjunct in the treatment of acute pulmonary edema, and in the treatment of hypertension, usually in combination with other drugs; administered orally, intramuscularly, or intravenously." *Id.* at 751.

[12] Potassium chloride is "an electrolyte replenisher . . . administered orally or by intravenous infusion." *Dorland's* at 1503.

67, and Petitioner was diagnosed with edema and prescribed ciprofloxacin[13] and directed to continue her Lasix prescription, *id.* at 70.

Petitioner returned to her PCP for a follow-up on February 29, 2016. Pet'r's Ex. 2 at 8. She reported that her muscle aches had been "stable and nonprogressive" and her edema "ha[d] been getting better recently." *Id.* Petitioner was assessed with muscle aches and edema and ordered to continue her current medication regimen. *Id.* at 9–10. She was also given a referral to a rheumatologist, *id.* at 10, and the third dose of the HPV vaccine at this visit, *id.* at 9.

Petitioner presented for her first rheumatology appointment with Kirk Jenkins, M.D., on March 14, 2016. Pet'r's Ex. 4 at 1. Petitioner reported that the "[p]ain started in [her] bilateral hands in late [January 2016]." *Id.* An examination revealed that Petitioner "ha[d] impressive boggy synovitis[14] in the bilateral [metacarpophalangeal joints ("MCPs")[15],]" and Dr. Jenkins noted that Petitioner's "[j]oints, bones, and muscles were abnormal." *Id.* at 1, 3. Dr. Jenkins had a "[h]igh suspicion for an inflammatory arthritis" based on the presence of "synovitis on exam[ and morning] stiffness[ that was] symmetrical[ and] improve[d] with movement." *Id.* at 4. Dr. Jenkins noted differential diagnoses of "RA [versus] seronegative spondy," although he felt that "RA . . . appear[ed] more likely at [that] time." *Id.* He assessed Petitioner with inflammatory arthritis, fatigue, and arthropathy.[16] *Id.* He wrote that Petitioner's fatigue was "related to her likely connective tissue disease[,]" which he noted he would "explore more at [the] next visit." *Id.* Dr. Jenkins prescribed Prednisone[17] and directed Petitioner to follow-up in two weeks. *Id.* at 5.

On March 28, 2016, Petitioner returned to Dr. Jenkins for a follow-up and complained of "continued bilateral hand pain and swelling." *Id.* at 6. On exam, Petitioner was "[u]nable to make a complete fist [with] either hand," and Dr. Jenkins again noted "[b]oggy synovitis in [Petitioner's] bilateral MCPs." *Id.* Dr. Jenkins again assessed Petitioner with inflammatory arthritis and fatigue. *Id.* at 9. He wrote that Petitioner's inflammatory arthritis was "[s]eronegative, nonerosive RA." *Id.* He noted that Petitioner's "[x-ray] and serologies [were] really unremarkable. However, [the history of present illness] and [physical examination] ma[de] the diagnosis." *Id.* Dr. Jenkins prescribed hydroxychloroquine sulfate,[18] methylprednisolone,[19] and Enbrel,[20] and told Petitioner to follow-up in two months. *Id.* at 10.

---

[13] Ciprofloxacin is "a fluoroquinolone anti-bacterial effective against many gram-positive and gram-negative bacteria, including some strains resistant to penicillins, cephalosporins, and aminoglycosides." *Dorland's* at 362.

[14] Synovitis is "inflammation of a synovium; it is usually painful, particularly on motion, and is characterized by a fluctuating swelling due to effusion within a synovial sac." *Dorland's* at 1856. A synovium (a.k.a. membrana synovalis capsulae articularis) is "the inner of the two layers of the articular capsule of the synovial joint, composed of loose connective tissue and having a free smooth surface of the lines the joint cavity. It secretes synovial fluid." *Id.* at 1127.

[15] Metacarpophalangeal joints (a.k.a. articulations metatcarpophalangeae) are the "joints formed between the heads of the five metacarpal bones and the proximal ends of the corresponding phalanges." *Dorland's* at 160.

[16] Arthropathy refers to "any joint disease." *Dorland's* at 158.

[17] Prednisone is "administered orally as an anti[-]inflammatory and immunosuppressant in a wide variety of disorders." *Dorland's* at 1509.

[18] Hydroxychloroquine sulfate is "administered orally" and "used . . . as an anti[-]inflammatory disease-

5

Petitioner presented to Dr. Jenkins for another follow-up on June 1, 2016. *Id.* at 11. Petitioner reported that her "[morning] stiffness, swelling and range of motion in the small joints of [her] hands [was] much improved." *Id.* An exam revealed "no active synovitis in the MCP's or [proximal interphalangeal joints]." *Id.* Petitioner had "full range of motion in the small joints of [her] hands . . . [and was tender to palpitation] to her right wrist . . .." *Id.* She also experienced "pain [in her right wrist] . . . with flexion and extension." *Id.* She had no symptoms in her left wrist. *Id.* Petitioner also had "subtle effusion on [her] bilateral knees." *Id.* Petitioner "continue[d] describing inflammatory joint pain in [her] hips and knees[,]" which "improved with movement and [was] complicated with [morning] stiffness." *Id.* Dr. Jenkins assessed Petitioner with arthropathy and inflammatory arthritis. *Id.* at 15. He directed Petitioner to continue the hydroxychloroquine sulfate, Enbrel, and prescribed meloxicam[21]. *Id.*

On August 1, 2016, Petitioner returned to Dr. Jenkins for a follow-up. *Id.* at 16. Petitioner reported "that the swelling and pain in her hands [was] much improved[,]" although she "still [experienced] some pain with palpitation to [her] bilateral MCP joints." *Id.* Petitioner's biggest complaint at this appointment "revolve[d] around her bilateral knee pain." *Id.* She stated that "[t]he pain in her knees [was] worse with movement and exacerbated at the end of the day[,]" which Dr. Jenkins wrote was "more supportive of mechanical osteoarthritis[22]." *Id.* Petitioner reported that "[t]he knee pain [was] improved . . . [by the] meloxicam[,] which she [was] using [one-to-two] times per week." *Id.* An examination revealed "some tenderness to the bilateral second and third MCPs with very subtle fullness." *Id.* Dr. Jenkins assessed Petitioner with RA, osteoarthritis, and fibromyalgia,[23] which Dr. Jenkins wrote was the cause of Petitioner's fatigue. *Id.* at 20. He directed Petitioner to continue the hydroxychloroquine sulfate, meloxicam, and Enbrel, and prescribed Neurontin.[24] *Id.*

Petitioner returned to Dr. Jenkins on November 1, 2016, for a follow-up. *Id.* at 22. Petitioner "complain[ed] of pain in [her] bilateral wrists and MCP joints," as well as "morning stiffness." *Id.* An examination revealed "active synovitis in [her] bilateral wrists and bilateral second/third MCP joints." *Id.* Dr. Jenkins noted that his examination was "complicated by fibromyalgia." *Id.* Dr. Jenkins' assessment included RA and fibromyalgia. *Id.* at 25.

On January 23, 2017, Petitioner had another follow-up with Dr. Jenkins. *Id.* at 34. Petitioner reported "improvement [with] her hand symptoms[,]" and noted that "[s]he [was able

---

modifying antirheumatic drug in the treatment of [RA] . . .." *Dorland's* at 881.

[19] Methylprednisolone is "administered orally" and "used . . . as an anti[-]inflammatory in a wide variety of disorders . . .." *Dorland's* at 1154.

[20] Enbrel is the "trademark for a preparation of etanercept[,]" which is "used in the treatment of [RA] and juvenile idiopathic arthritis[]" that is "administered subcutaneously." *Dorland's* at 612, 650.

[21] Meloxicam is "a non[-]steroidal anti[-]inflammatory drug used in the treatment of osteoarthritis" that is "administered orally." *Dorland's* at 1126.

[22] *See supra* note 8.

[23] Fibromyalgia is characterized by "pain and stiffness in the muscles and joints that either is diffuse or has multiple trigger points." *Dorland's* at 703.

[24] Neurontin is the "trademark for preparations of gabapentin[,]" *Dorland's* at 1268, which is "an anticonvulsant that is . . . used as an adjunctive therapy in the treatment of partial seizures[]" that is "administered orally[,]" *id.* at 753.

to move her wrists more freely than before." *Id.* She also reported continued "knee and hip pain[,]" as well as "low back pain" that began "after a recent stomach bug." *Id.* She described the back pain as "constant." *Id.* Dr. Jenkins noted that Petitioner had improving range of motion in her wrists, fullness in her right first and left third MCP joints, and that the tenderness in Petitioner's joints overall had improved. *Id.* Dr. Jenkins' assessment again included RA and fibromyalgia. *Id.* at 38.

### III. Attorneys' Fees and Costs

#### A. Good Faith

Under the Vaccine Act, a special master may award fees and costs for an unsuccessful petition if "the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought." 42 U.S.C. § 300aa–15(e)(1); *see also Sebelius v. Cloer*, 569 U.S. 369, 376 (2013). "Good faith" is a subjective standard. *Hamrick v. Sec'y of Health & Human Servs.*, No. 99-683V, 2007 WL 4793152, at *3 (Fed. Cl. Spec. Mstr. Nov. 19, 2007). Petitioners act in "good faith" if they hold an honest belief that a vaccine injury occurred. *Turner v. Sec'y of Health & Human Servs.*, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Petitioners are "entitled to a presumption of good faith." *Grice v. Sec'y of Health & Human Servs.*, 36 Fed. Cl. 114, 121 (1996) (noting that in the absence of evidence of bad faith, the special master was justified in presuming the existence of good faith). Respondent does not contest that this petition was filed in good faith, *see* Resp't's Resp. at 5, and I find that the good faith standard is met in this case.

#### B. Reasonable Basis

Respondent does, however, contest the reasonable basis for this petition. *Id.* "Reasonable basis" is not explicitly defined in the Vaccine Act or Rules. Deciding whether a claim has a reasonable basis "is within the discretion of the Special Master . . . ." *Simmons v. Sec'y of Health and Human Servs.*, 128 Fed. Cl. 579, 582 (2016), *aff'd*, 875 F.3d 632 (Fed. Cir. 2017) (internal citations omitted).

In determining reasonable basis, a court looks not at the likelihood of the claim's success, but instead assesses its feasibility based on objective evidence. *Turner*, 2007 WL 4410030, at *6 (citing *Di Roma v. Sec'y of Health and Human Servs.*, No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993)). Thus, petitioners must offer more than an unsupported assertion that a vaccine caused the injury alleged. *See, e.g.*, *Perreira v. Sec'y of Health & Human Servs.*, 33 F.3d 1375, 1377 (Fed. Cir. 1994); *McKellar v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 297, 303–04 (2011); *Cortez v. Sec'y of Health & Human Servs.*, No. 09-176V, 2014 WL 1604002, at *5 (Fed. Cl. Spec. Mstr. Mar. 26, 2014). Petitioners must "affirmatively demonstrate [the] reasonable basis" of their claim through some objective evidentiary showing. *McKellar*, 101 Fed. Cl. at 305. Such a showing "must, at a minimum, be supported by medical records or medical opinion." *Everett v. Sec'y of Health and Human Servs.*, No. 91-1115V, 1992 WL 35863, at *2 (Fed. Cl. Spec. Mstr. Feb 7, 1992). In addition, "because Vaccine Act claims may involve state-of-the-art scientific developments, untested theories, and unknown interactions and results, these difficult cases may entail close calls . . . [and] the standard for assessing . . . reasonable

basis . . . should reflect this reality." *Cottingham v. Sec'y of Health and Human Servs.*, 134 Fed. Cl. 567, 574 (2017).

### i. Arguments

#### 1. Respondent

Respondent's argues, as an initial matter, that Petitioner "did not state why her claim had a reasonable basis" in her initial motion. Resp't's Resp. at 6. Respondent notes that Petitioner needed to "affirmatively demonstrate a reasonable basis" for her petition because her claim was unsuccessful. *Id.* (quoting *McKellar*, 101 Fed. Cl. at 305). He argues that Petitioner failed to meet this burden because her original motion only contained a "conclusory statement" that, "because there was a reasonable basis for [her] to bring her claim[,] . . . [she] is entitled to recover her attorney's fees and expenses." *Id.* (quoting Pet'r's Mot. for AFC at ¶ 5).

Respondent also argues that "there was no evidence that could causally link [P]etitioner's first . . . or second HPV vaccination[s] . . . to the development of her RA . . . ." *Id.* He notes that "no treating physician linked [Petitioner's] condition to her vaccination[,]" and Petitioner" failed to present any evidence that would justify vaccine-causation in such an extended timeframe." *Id.*

Lastly, Respondent writes that, in order for Petitioner to demonstrate entitlement with respect to the third HPV vaccination, "[P]etitioner must have been able to show that the vaccine 'significantly aggravated' her pre-existing condition . . . ." *Id.* Respondent contends that "there [was] no evidence that [P]etitioner's condition changed all [(sic.)] following her third HPV vaccination . . . ." *Id.* Rather, Respondent argues that the evidence showed that "[P]etitioner's condition actually improved in the months following her third HPV vaccination (albeit with medication)." *Id.* (citing Pet'r's Ex. 4 at 11, 16).

#### 2. Petitioner

Petitioner contends that "Respondent's argument[s that Petitioner's claim lacked a reasonable basis are] tantamount to a conclusory assertion . . . that Petitioner failed to satisfy the *Althen* prongs." Pet'r's Reply at 2. Petitioner argues that Respondent "points to no specific authority that Petitioner is required to satisfy the *Althen* prongs and/or provide treating physician support to justify a finding of reasonable basis." *Id.* Petitioner notes that, if "Respondent's argument [was] accepted as presented," then "it would require Petitioner to either prevail . . . or face the near impossibility of establishing reasonable basis in any . . . case not found in favor of Petitioner . . . ." *Id.* She argues that this standard "was surely not intended . . . by Congress when . . . [it] provid[ed] for the payment of fees and expenses in cases that did <u>not</u> prevail on entitlement." *Id.* at 3 (emphasis in original).

Petitioner notes that "[i]t is accepted in the [V]accine [P]rogram that HPV vaccination can caue juvenile idiopathic arthritis[,] . . .a condition similar to [the] RA experienced by Petitioner in this case." *Id.* at 5. Petitioner also lists other cases in the Vaccine Program that she alleges "hav[e] . . . awarded significant compensation[]" for claims "alleging RA/[juvenile idiopathic arthritis] following HPV" vaccination. *Id.* at 5–6 (citing *Cechanowicz v. Sec'y of*

*Health and Human Servs.*, No. 14-469V, 2018 WL 2772176 (Fed. Cl. Spec. Mstr. Apr. 30, 2018); *Schwartz v. Sec'y of Health and Human Servs.*, No. 11-579V, 2015 WL 5895402 (Fed. Cl. Spec. Mstr. Sept. 17, 2015); *Stacy v. Sec'y of Health and Human Servs.*, No. 10-449V, 2015 WL 6182330 (Fed. Cl. Spec. Mstr. Sept. 17, 2015)).  Petitioner argues that these cases "supported [her] reasonable basis for pursuing her claim and working to develop it further, particularly because [she] did not have access to the underlying medical facts to critically compare her case to those [cited] above." *Id.* at 6.

Petitioner also argues that "Gardasil's own package insert lists reported cases of RA following vaccination[,]" although she notes that the insert "does not seek to establish a causal association that meets [V]accin[e P]rogram standards . . . ." *Id.* (citing Pet'r's Reply, Ex. 2 at 8, ECF No. 46-2).  The package insert also "specifically notes that the definition of RA includes [juvenile idiopathic arthritis.]" *Id.*  Petitioner argues that a prior Vaccine Program case, *Ramsay v. Sec'y of Health and Human Servs.*, No. 11-549V, 2015 WL 9665584, at *16–17 (Fed. Cl. Spec. Mstr. Dec. 18, 2015), found that the HPV vaccine "can act as a trigger and cause [juvenile idiopathic arthritis]." *Id.*  Petitioner notes that in the *Ramsay* case, the special master also found that onset occurring "four and a half months after the second Gardasil vaccination—and seven to eight months after the first vaccination—[were] appropriate . . . ." *Id.* at *18.  Therefore, Petitioner argues that "there [was] at least some evidence that [her] onset of RA occurred within a timeframe within which it would be medically acceptable to infer causation." Pet'r's Reply at 6–7.

Lastly, Petitioner states that she "had her case reviewed by an independent expert prior to proceeding to further develop and file it." *Id.* at 7.  She provided a letter from Paul Utz, M.D., which discusses Petitioner's interactions with Dr. Utz prior to filing her claim.  *See* Pet'r's Reply, Ex. 3, ECF No. 46-3.  Dr. Utz wrote that he "was contacted by Petitioner's counsel in April 2017 to conduct a preliminary review of [this] matter . . . ." *Id.*  Dr. Utz concluded, "[a]fter review[ing] . . . the timeline provided by Petitioner's counsel . . . and associated case law related to a similar injury in a similar timeframe following vaccination," that "it was reasonably justifiable to pursue the case further." *Id.*  However, Dr. Utz wrote that "by the time the case was filed at the end of 2017 and Respondent contested compensation in August 2018, [he] was no longer able to assist with the case due to other time commitments . . . ." *Id.*  When approached by Petitioner's counsel to opine on causation, Dr. Utz told Petitioner's counsel that he "had stopped taking new cases" and had "not taken a new vaccine case since February 2018." *Id.*  Petitioner avers that, "once [Dr. Utz] was no longer available [to provide an expert report in her case], [she] was forced to dismiss her claim." Pet'r's Reply at 7.

### ii. Analysis

Petitioner's evidence, both submitted during the entitlement phase of her claim and with her fees motion, establishes that she possessed a reasonable basis to bring her claim.  Two pieces of evidence in particular demonstrate the feasibility of Petitioner's claim.  First, Petitioner hired an expert to conduct a review of her claim *before* she filed.  Based on the expert's review of Petitioner's case and prior Vaccine Program cases, he recommended that Petitioner proceed with her claim.  This is the exact pre-filing investigation that will save the Program and all parties involved time, money, and resources.  It is unclear why Respondent would choose to contest

9

reasonable basis in the face of this expert opinion. Second, Petitioner also submitted the vaccine package insert, which listed reported cases of RA following HPV vaccination. Although it did not state a definitive causative connection, it is notable that the vaccine manufacturer found the association important enough to list it.

Petitioner is correct that Respondent is attempting to hold her and other similarly situated petitioners to a reasonable basis standard centered around the likelihood of success rather than on feasibility. Respondent states this position concretely when discussing the third HPV vaccination, arguing that, for Petitioner "to have shown entitlement to compensation with respect to the third HPV vaccination[] . . .." Why Respondent is discussing entitlement in the context of reasonable basis is unclear, but the standard for reasonable basis is *not* entitlement to compensation. His arguments with respect to the third HPV vaccination therefore have no merit.

Respondent also incorrectly argues that Petitioner's claim lacked a reasonable basis, because there was no "objective evidence" linking Petitioner's alleged injury to the HPV vaccinations. He based this argument, at least in part, on the fact that none of Petitioner's "treating physician[s] linked her condition to her vaccinations." However, as Respondent is aware, a medical record from a treating physician linking a vaccination to an injury is the exception, not the rule. Many treating physicians are hesitant to link vaccinations to injuries for numerous reasons. In addition, most treaters are not qualified to make this determination, as opining on causation can require specialized training in immunology, toxicology, or another similar specialty. If it becomes mandatory for a finding of reasonable basis to have a treating physician link the vaccination to the injury, then a large majority of petitioners will fall short of this requirement through no fault of their own.

Lastly, it is notable that Respondent chose not to raise a reasonable basis issue at any time during the entitlement phase of this case despite numerous opportunities to do so. For example, Respondent submitted a Rule 4(c) report on August 30, 2018, in which he outlined all of Petitioner's relevant medical history and his arguments against compensation. Respondent *failed* to raise any question regarding reasonable basis in this report. He also failed to raise this argument during the five months when Petitioner was attempting to obtain an expert report. Instead, Respondent decided to raise this argument for the first time in his response to Petitioner's attorneys' fees motion. If Respondent had noted a potential reasonable basis objection earlier, it may have helped foster a more candid discussion of the merits and an earlier disposition of the case, saving both parties and the Court time and resources.

For the reasons stated above, I find that Petitioner had a reasonable basis to bring her claim, and therefore is entitled to her reasonable attorneys' fees and costs.

### C.  Reasonable Attorneys' Fees and Costs

#### i.  Reasonable Rates

Forum rates are used in the lodestar formula, except when the rates in an attorney's local area are significantly lower than forum rates. *Avera v. Sec'y of Health and human Servs.*, 515 F.3d 1343, 1348–49 (Fed. Cir. 2008). In a 2015 decision, Special Master Gowen determined the

reasonable forum rate ranges for attorneys with varying years of experience. *See McCulloch v. Sec'y of Health & Human Servs.*, No. 09-293V, 2015 WL 5634323, at *18–19 (Fed. Cl. Spec. Mstr. Sept. 1, 2015), *mot. for recons. denied*, 2015 WL 6181910 (Fed. Cl. Spec. Mstr. Sept. 21, 2015). When considering whether a requested rate is reasonable, special masters may consider an attorney's overall legal experience and his experience in the Vaccine Program, as well as the quality of the work performed. *Id.* at *17. The *McCulloch* rates have been updated for subsequent years and are accessible on the Court's website at http://www.uscfc.uscourts.gov/ vaccine-programoffice-special-masters.

### 1. Requested Rates

Petitioner requests the following hourly rates for the attorneys and paralegals who worked on this matter:

- Michael G. McLaren:
    - 2017: $440.00
    - 2018: $456.00
    - 2019: $473.00
- Chris J. Webb:
    - 2017: $315.00
    - 2018: $326.00
    - 2019: $338.00
- William E. Cochran, Jr.:
    - 2017: $365.00
    - 2018: $377.00
- Law Clerks:
    - 2017: $148.00
    - 2018: $153.00
    - 2019: $156.00
- Paralegals:
    - 2017: $145.00

Mr. McLaren and the attorneys at Black McLaren, et al., PC, practice in Memphis, Tennessee, and they have previously been awarded forum rates in the Program. *See*, *e.g.*, *Sturdevant v. Sec'y of Health and Human Servs.*, No. 17-172V, 2019 WL 4568158, *3 (Fed. Cl. Spec. Mstr. Aug. 26, 2019) (citing *Teter ex rel. S.T. v. Sec'y of Health and Human Servs.*, No. 17-1801V, 2019 WL 2406958 (Fed. Cl. Spec. Mstr. May 17, 2019)).

The rates requested by Petitioner for Mr. Webb, Mr. Cochran, and the firm's law clerks and paralegals are in line with *McCulloch* and have been awarded in the Program previously. *See Teter*, 2019 WL 2406958, at *2; *Sturdevant*, 2019 WL 4568158, at *3; *Dix v. Sec'y of Health and Human Servs.*, No. 17-1859, 2019 WL 4467108, *3 (Fed. Cl. Spec. Mstr. June 25, 2019). I find these rates reasonable and award them in full. However, Mr. McLaren's rates for 2018 and 2019 require an adjustment. In accordance with *McCulloch* and other decision in the Program, I will reduce Mr. McLaren's 2018 rate to $455.00 and his 2019 rate to $464.00. *See Dix*, 2019

WL 4467108, at *2; *Sturdevant*, 2019 WL 4568158, at *3; *Teter*, 2019 WL 2406958, at *2. This results in a total reduction of **$14.90**.

### ii. Reasonable Hours Expended

The second step in *Avera* is for the Court to make an upward or downward modification based upon specific findings. *Avera*, 515 F.3d at 1348. As outlined below, I have determined that a reduction in the number of hours requested is appropriate. While clerical and other administrative work is necessary in every case, billing separately for such work is not permitted in the Vaccine Program. *Rochester v. United States*, 18 Cl. Ct. 379, 387 (1989) (tasks that were "primarily of a secretarial and clerical nature . . . should be considered as normal overhead office costs included with the attorneys' fees rates"). Clerical and administrative work includes tasks such as making travel arrangements, setting up meetings, and reviewing invoices. *See Mostovoy v. Sec'y of Health & Human Servs.*, No. 02-10V, 2016 WL 720969, at *5 (Fed. Cl. Spec. Mstr. Feb. 4, 2016). It also includes organizing exhibits, preparing compact discs, and filing records. *Floyd v. Sec'y of Health & Human Servs.*, No. 13-556V, 2017 WL 1344623, at *5 (Fed. Cl. Spec. Mstr. Mar. 2, 2017); *Hoskins v. Sec'y of Health & Human Servs.*, No. 15-071V, 2017 WL 3379270, at *3 (Fed. Cl. Spec. Mstr. July 12, 2017); *Kerridge v. Sec'y of Health & Human Servs.*, No. 15-852V, 2017 WL 4020523, at *3 (Fed. Cl. Spec. Mstr. July 28, 2017). It is the nature of the tasks performed, not a person's professional title, which determines whether the work is legal, paralegal, or clerical in nature. *Doe 11 v. Sec'y of Health & Human Servs.*, No. XX–XXXV, 2010 WL 529425, at *9 (Fed. Cl. Spec. Mstr. Jan. 29, 2010) (citing *Missouri v. Jenkins,* 491 U.S. 274, 288 (1989)).

After reviewing the law clerks' billing entries, I find that they routinely billed for administrative work such as scanning and preparing documents for filing and calendaring events, which are not compensable in the Vaccine Program. *See*, *e.g.*, Pet'r's Mot. for AFC, Ex. 2, at 4 (entry on 8/30/2017 noted that a law clerk billed to "work on scanning and saving" an invoice from a healthcare provider); *id.* at 5 (entry on 10/10/2017 noted that a law clerk billed to "work on scanning and saving" medical records); *id.* at 6 (entry on 12/8/2017 noted that a law clerk billed to "prepare petition and cover sheet for filing"); *id.* at 7 (entry on 1/2/2018 noted that a law clerk billed to "update calendar to reflect new deadlines"). Therefore, I will reduce the total time billed by the law clerks by 10%, or **$240.03**.

In addition, as other special masters have found, the staffing model utilized by the Black McLaren, et al., PC firm leads to inefficiency and unnecessary billing entries. *See Wagner v. Sec'y of Health and Human Servs.*, No. 17-0407V, 2019 WL 4303281, *2–3 (Fed. Cl. Spec. Mstr. June 28, 2019). Three attorneys, two law clerks, and a paralegal all billed in this case. I will therefore make a 5% reduction to Petitioner's total fee request. This results in a reduction of **$1,668.46**.

### iii. Reasonable Costs

Similar to attorneys' fees, a request for reimbursement of costs must be reasonable. *Perreira v. Sec'y of Health & Human Servs.*, 27 Fed. Cl. 29, 34 (1992). Petitioner requests a total of $4,522.84 in costs. Of this amount, Petitioner requests reimbursement for Mr. Webb's

two-night stay at the Marriot in Lexington, KY beginning on January 8, 2018. Pet'r's Mot. for AFC, Ex. 2 at 28. The receipt shows a nightly rate of $201 and $211, respectively, before various taxes and fees. *See id.* Mr. Webb also submitted receipts for a rental car charges totaling $222.57. *See id.* at 25. I find these costs reasonable and award them in full.

While I find that Mr. Webb's hotel and rental car costs are reasonable, reductions are necessary to Mr. Webb's airline costs. Mr. Webb submitted receipts for an airline trip from Memphis, TN to Lexington, KY reflecting a base fare of $816.74, before various taxes and fees. *Id.* at 35–36. The billing records reflect that Mr. Webb billed .2 hours to "confer with [Petitioner] regarding meeting with her" on December 10, 2017. *Id.* at 6. This is the earliest billing record reflecting a meeting with Petitioner. Mr. Webb did not submit documentation reflecting when he finalized the meeting date with Petitioner, but the airline receipts reflect that he booked his airfare on December 28, 2017. *Id.* at 29. A basic search on the Delta website reveals that a trip from Memphis, TN to Lexington, KY, with a layover in Atlanta, GA—the exact itinerary Mr. Webb experienced—booked eleven days in advance range in price from $486.50 for a basic ticket to $939.00 for a first-class ticket.[25] I will therefore make a **$225** reduction to Mr. Webb's airline costs.

Mr. Webb's food costs during his trip also require a reduction. Mr. Webb submitted receipts for two dinners at the hotel costing $72.95 and $65.33, respectively. *Id.* at 28. It is unclear what Mr. Webb purchased during these meals, but the costs seem excessive for the Lexington, KY location. Because Mr. Webb did not submit an itemized receipt for these meals, I will make a reduction to these costs of **$90.28**.

Petitioner also requests $2,000.00 in expert costs related to an expert review conducted by Dr. David Rosenstreich. *Id.* at 39. Dr. Rosenstreich is board-certified in internal medicine, allergy and immunology, and diagnostic and laboratory immunology and has provided expert opinion in previous Program cases. *See* Pet'r's Mot. for AFC, Ex. 3 at 2; *see also Schmidt v. Sec'y of Health and Human Servs.*, No. 11-620V, 2017 WL 393332 (Fed. Cl. Spec. Mstr. Jan. 4, 2017). In my experience, this is a reasonable cost in retaining an expert review and I therefore award this cost in full.

Petitioner's remaining costs are associated with obtaining medical records, postage, and the Court's filing fee. Petitioner has submitted adequate documentation to support these costs and in my experience they are reasonable. Accordingly, I award Petitioner's remaining costs in full.

### IV. Conclusion

In accordance with the Vaccine Act, I award Mr. McLaren $ $31,565.51 in attorneys' fees and $4,102.56 in costs. Accordingly, I award the total of **$35,773.07** to be issued in the form of a check payable jointly to Petitioner and Petitioner's counsel, Mr. Michael G. McLaren, of Black McLaren, et al., PC, for attorneys' fees and costs.[26]

---

[25] *See* Dec. Attach., Ex. 1.

[26] Pursuant to Vaccine Rule 11(a), entry of judgment is expedited by the parties' joint filing of a notice renouncing the right to seek review.

**IT IS SO ORDERED.**

                                                       s/Herbrina D. Sanders
                                                       Herbrina D. Sanders
                                                       Special Master